GULF, C. & S. F. RY. CO. v. MOSS et ux. (No. 7378.)

(Court of Civil Appeals of Texas. Dallas. Nov. 30, 1915. Rehearing Denied Dec. 11, 1915.)

1. NEGLIGENCE ☞39 — TRESPASSERS — WHO ARE.

The doctrine of the turntable cases does not apply to a railroad company which had fenced off its right of way, and a child who slipped through a hole broken in the fence is a trespasser, though some of the railroad company's servants had knowledge of the hole.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 55; Dec. Dig. ☞39.]

2. RAILROADS ☞359—INJURIES TO PERSONS ON TRACKS—LOOKOUT.

Where a railroad company fenced its right of way and attempted to keep trespassers and others away, it is not guilty of negligence because not maintaining a lookout to discover whether small children were under or beneath its cars before starting a train which had been stopped only a few minutes; for that would have practically required employés to go the entire length of the train.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1238, 1239; Dec. Dig. ☞359.]

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

3. RAILROADS ☞398—INJURIES TO PERSONS ON TRACKS—ACTIONS—NEGLIGENCE.

Where the manner in which a small child trespassing on railroad tracks met his death under a train was not disclosed, it not being shown whether he attempted to board the train or whether he was underneath the cars when started, the failure of the railroad company to maintain a lookout to discover children's presence before starting the train was not the proximate cause of the injury.

[Ed. Note.—For other cases, see Railroads, Cent.Dig. §§ 1356, 1358–1363; Dec.Dig. ☞398.]

Appeal from District Court, Dallas County; E. B. Muse, Judge.

Action by T. G. Moss and wife against the Gulf, Colorado & Santa Fé Railway Company. From a judgment for plaintiffs, defendant appeals. Reversed and rendered.

Terry, Cavin & Mills, of Galveston, Lee & Lomax, of Ft. Worth, and E. M. Browder, of Dallas, for appellant. W. W. Nelms and El J. Gibson, both of Dallas, for appellees.

TALBOT, J. T. G. Moss and wife brought this suit to recover damages alleged to have been sustained by them on account of the death of their minor son, Carlean Moss, who was run over by a train of freight cars owned by the appellant and being operated by its servants in its switchyard at Dallas, Tex., on October 19, 1913.

The petition, so far as is necessary to state, alleges, in substance, that prior to the injury complained of defendant had built a high board fence along its right of way, surrounding its switchyard in East Dallas, for the purpose of preventing children of tender years from going into and upon its tracks, but that on the date of the accident, and prior thereto, defendant had negligently permitted an opening to be made in such fence near the intersection of Ferris and Merlin streets, through which opening the public, including children and some of defendant's employés, were accustomed to enter defendant's yards, and that defendant had knowledge of such custom, and, having acquiesced therein, persons who entered its yards at that point became licensees; that on the day of the accident one of appellant's trains had stopped in its yard, with the rear car about 50 feet south of the hole in the fence referred to, and that plaintiffs' son, being of immature years and incapable of appreciating the danger of so doing, caught on one of the cars in the train, and thereafter fell beneath the wheels when the train was put in motion and was killed; that, under the facts and circumstances as they existed at the time plaintiffs' son was run over and killed, it was the duty of the defendant company to keep a proper lookout upon its tracks in every direction and to prevent their son from entering upon defendant's premises or going upon its railway tracks or upon its cars, but that defendant wholly failed at the time of the injury of their son to maintain and keep such a lookout or a lookout such as the facts and circumstances in evidence demanded, and, wholly failed to warn their said son of the dangers incident to entering upon its said premises and railway tracks and cars; and that the failure to keep such lookout and give such warning was the proximate cause of the fatal injury to their son, Carlean Moss. The defendant denied the issues of negligence as tendered by plaintiffs, and averred that by constructing the fence surrounding its yards, and by repeatedly closing the holes in the fence when the boards were torn off, and by repeated written and verbal warnings, persons who entered its yards were advised that their conduct in so doing was against the wish and desire of defendant, and that deceased therefore was not a licensee, but a trespasser, whose presence was never discovered until after the accident, and wherefore defendant was not liable. Defendant pleaded also contributory negligence both on the part of plaintiffs and their deceased son, barring a recovery.

The defendant objected to the submission of the case to the jury and to the court's charge prepared for that purpose, and requested a special charge directing the jury to return a verdict in its favor; but the objections and special charge requested were overruled and denied, and the jury instructed, in substance, that if they should find that the servants of the defendant in charge of its train failed to exercise ordinary care to keep a lookout for and avoid injuring plaintiffs' son, Carlean Moss, and such failure was the proximate cause of his injury and death, to find for plaintiffs. The jury's findings were favorable to the plaintiffs, and their damages assessed at $2,500. The issues of contributory negligence on the part of Carlean Moss and of his parents were also submitted to the jury and resolved by the jury in favor of plaintiffs. There is little or no conflict in the evidence affecting the issue submitted to the jury. The plaintiffs' son, Carlean Moss, on the 19th day of October was struck or run over by a train of freight cars being moved along the main track of defendant's road in its switchyard in East Dallas, and as a result of the injury received died about 3 o'clock in the afternoon of that day. At the time injured Carlean was seven years, three months, and a few days old. He lived with his parents at 2731 Ferris street, about 50 yards west of Merlin street, and there were many other houses on Ferris street fronting the defendant's railroad tracks and occupied by families, neighbors of the plaintiffs; in other words, that portion of the city of Dallas contiguous to or near defendant's said switchyard was thickly populated. Ferris street runs practically east and west, and Merlin street runs about north and south. The defendant's switchyard was on the south side of

Ferris street, and between Ferris street and the main track upon which Carlean was struck and injured there was a switch track called the scale track. Along the south side of Ferris street and between it and the defendant's switchyard there was a plank fence about 6 feet high, built by the defendant with a view of preventing persons from going upon its premises and railroad tracks. This fence runs east and west parallel with the defendant's railway tracks and switchyard for several blocks. About on a line with the west side of Merlin street, which intersects Ferris street, two or three planks had been knocked off the fence, making a hole therein about 3 feet wide, through which people could easily pass. This hole had been in the fence some months probably prior to the accident in question. It seems that about as fast as the employés of the defendant would nail the planks on and close the hole some person or persons unknown to them would knock them off. Many persons were in the habit of passing through this hole and thence upon and across defendant's railroad tracks going to church and other places. Some of the employés of defendant also passed through this hole in the fence going to and returning from their work, and children habitually passed through the hole and upon defendant's premises and tracks at that point. This was known to defendant's employés, but without their consent and over their protest. Signs were posted warning persons of the danger of going upon the railroad tracks, and numerous means were resorted to by defendant to give warning of such danger and to prevent trespassing upon its property. These warnings and efforts, however, had been up to the time of the injury to Carlean Moss ignored. On the day Carlean Moss was injured the switch crew of defendant came into the switchyard with a train of some 18 or 20 cars. This train came from the west going east. The train crew consisted of B. S. Miller, engineer, G. M. Dooley, fireman, R. D. Vaughan, foreman, and L. Combs and G. M. Mays, switchmen or helpers. Mr. Vaughan controlled the movements of the train, and as the train moved east he and one of the "helpers" rode on the front end of the engine, or on the south side thereof, and the position of the other "helper" was on the rear part of the train. The engineer and fireman occupied positions in the cab of the engine—the engineer on the right side and the fireman usually on the left side. When the train causing the death of Carlean Moss came into the switchyard, it was stopped on the main track with some of the cars east and some of them west of Merlin street and the hole in the fence. Some of the witnesses stated that the train was stopped with the middle opposite the hole in the fence. The train remained standing in this position two or three minutes, and was then started forward again. Just after the train was thus started screams of a child were heard by G. M. Mays, the rear helper, and Mrs. Long, a neighbor of the plaintiffs, and probably other neighbors. It was discovered that this child was Carlean Moss. Prior to the time he screamed he had not been seen near or upon the railroad track by any employé of the defendant. The first employé of the defendant that saw him was G. M. Mays, the rear "helper." He testified that the first "I knew of this accident was when the boy holloaed"; that, when the car passed, the boy was sitting near the switch stand, something like 8 or 10 feet, holding up the stub of his leg like that (indicating), holloaing; that prior to that time he had not seen or heard the boy; that as he came up there he was facing the fence and looking behind, looking out for the rear end of the train; that he was sitting on the running board in the middle of the car or something near the middle of the car, and on top of the car; that, when he saw the boy there on the ground and heard him holloa, the next thing he did was to report it to his foreman. The witness Mrs. Long having heard the screams of the little boy, ran to him, and a little later his father came and carried him home. He was thence, it seems, carried to St. Paul Sanitarium, and shortly thereafter died. When seen sitting near the switch stand, and when picked up by by his father, he was, with reference to the hole in the fence, about 50 feet east of it. About ten minutes before the accident Mrs. Gooch, a neighbor of the plaintiffs, saw Carlean Moss and his little sister and told them "not to go inside of the fence there; some day one or the other of them would get killed." She further stated that she did not see Carlean after he got inside the fence, and that the first thing that attracted her attention was his screams. At the time the accident occurred the members of the train crew were in their respective places on the train, and no one of them occupied a position from which he could have seen the accident, except possibly the fireman and the rear helper, Mays, and no special effort was made by either of them at the time the train was started after it was stopped in the yards to ascertain whether or not any person was on or near that portion of the train that struck Carlean Moss, or on or attempting to get on the train at any point between the engine and rear car. Just when he went to the train or what he was doing at the time he was struck or run over does not appear. He was not struck by the engine, but by some car of the train that was west of the hole in the fence.

The contention of the appellant is, in substance: (1) That it did not owe Carlean Moss, or the plaintiffs, the duty to keep a lookout to discover his presence at the place where he was struck and injured by the train, and that, as there was no evidence adduced showing or tending to show that his

presence was discovered in time to have prevented injury to him, the trial court erred in not instructing the jury, as requested, to return a verdict in its favor; (2) that the evidence adduced at the trial in support of appellee's action was not legally sufficient to warrant the submission of the case to a jury, because it does not appear therefrom, even if it was appellant's duty to keep a lookout to discover the presence of Carlean Moss, that the failure to keep such a lookout was the proximate cause of his injury and death, and for this reason the court should have instructed a verdict in its favor.

[1, 2] It is not contended, nor could such contention reasonably be made, that the case comes within the rule applicable to and governing what are known as the turntable cases. In such cases liability is predicated upon the fact that a turntable is a dangerous thing, that it is peculiarly attractive to children as a plaything, the danger of which they are not capable of appreciating, and "that to leave them exposed should be deemed equivalent to an invitation to use them, or that, when unsecured, they are so obviously dangerous to children that, when it is discovered that they are using them, it is negligence on the part of the owner not to take some steps to guard them against the danger." It is, however, fundamental that, in an action to recover damages for injury to or death of a child, as in cases where damages are sought to be recovered for injuries to or the death of adults, there can be no recovery unless the defendant has been guilty of a breach of duty. Clearly Carlean Moss was a trespasser upon appellant's premises, and the first question is: Was the appellant guilty of a breach of duty owed by it to him in failing to keep a lookout such as would probably have been necessary to discover his presence along its train of 18 or 20 cars, just before or at the time said train was put in motion, after it had been stopped a few minutes near the place where the accident occurred to see if he or some one might be in dangerous proximity to its train, it appearing that many persons, including small children, habitually passed through the hole in the plank fence and upon appellant's track near the place where the said Carlean Moss was injured? To answer this question in the affirmative would be equivalent to holding that it was the duty of the appellant, before starting its train at the time and place in question, to have sent some one of its employés along practically the entire length of the train to ascertain if any person was on or under any one of the cars of the train or within such proximity thereto as to reasonably lead to the belief that he would get on or under the car and into a place of danger. A lookout less than this would have been inadequate. No adjudicated case has been cited holding that such a duty rests upon a railway company under such or a similar state of facts as we have in the present case, and we know of no case so holding. On the contrary we think the case of Railway Company v. Davis, 110 S. W. 939, in which a writ of error was denied by the Supreme Court, holds, in effect, that no such duty is imposed upon railway companies. In that case the appellee, Davis, was injured in the yards of the railway company at Mt. Pleasant, Tex. His leg and arm were run over by the wheels of one of the appellant's freight cars on which he had been riding, and badly injured. He lacked two months of being nine years of age. The tracks of the railway company at Mt. Pleasant consisted of the main line and two switch tracks, all of which ran practically north and south through the town. A large number of residences were situated on the east side of the railroad, and the school building and business houses were on the west side. On the day young Davis was injured one of appellant's local freight trains arrived at Mt. Pleasant, and the crew did some switching in the yards. In doing this work the engine ran back on the house track to a point near the depot, passing the place where Davis and some of his companions were sitting, and then started back south with two box cars attached. When the train passed Davis and his companions going south they were sitting or standing within a few feet of the track, and as the cars passed Davis and a boy about his age swung onto the rear car, with the intention of riding down to the switch and back again. After riding some distance Davis fell from the car and received the injuries stated. The negligence relied upon for a recovery consisted of the alleged failure of the railway company's employés to exercise ordinary care to prevent Davis from swinging onto or getting on the cars or in a place of danger when he was liable to be injured in the ordinary operation of the train, and in failing to discover and protect him after he did so, that Davis was an immature child, without sufficient judgment and discretion to understand and appreciate the danger of such risks, and that such conditions existed at Mt. Pleasant at the time of the accident as would reasonably put the appellant's employés upon notice that an attempt to ride upon its cars by Davis and other immature children would be made. Much testimony was offered upon the trial tending to show that for a considerable time prior to the date of the accident a large number of children, ranging in age from six to fifteen years, were in the habit of congregating at the appellant's depot in the town of Mt. Pleasant and riding on its cars; that they would swing onto moving freight trains and passenger coaches whenever opportunity offered. In rebuttal, the railway company introduced evidence to the effect that its employés had made repeated efforts to put a stop to this practice of the children; that they had warned them of its danger, and had driven them off when discovered riding on or about their trains;

that they had applied to the officers for and had received assistance from them in keeping the children away from their trains, but that, in spite of those and other efforts, they were unable to keep many small boys from stealing rides. The conductor of the train testified that a short time before the accident, and while they were switching in the yards, he saw some boys there about the cars and made them leave, but the testimony made it clear that none of the train crew, or any employé of the railway company, saw Davis when he swung onto the side of the car. After reviewing charges given by the trial court on the issue of contributory negligence, and stating that the charge given and the refusal of the court to give special charges requested by the railway company was sufficient grounds to reverse, the Court of Civil Appeals said they would not dispose of the case on those grounds alone, for the reason that, in the opinion of the court, the case should be reversed and judgment rendered in favor of the railway company, on the ground that the evidence was insufficient to warrant a verdict for the appellee Davis. The court then proceeds to cite and discuss "turntable cases," states the exceptions, based upon principles of humanity, to the general rule that the owner of premises or machinery owes no duty to a trespasser further than not to willfully or wantonly injure him after discovering his presence, and recognizes the doctrine that the duty is imposed upon railway companies in the operation of their trains to keep a lookout in the direction in which the trains are being moved to prevent injuring those who may be upon the track, and that a failure in the performance of that duty will render the company liable for injuries sustained by those who are in law deemed incapable of being guilty of contributory negligence, or who may be there under circumstances that negative the existence of contributory negligence, citing Railway Co. v. Watkins, 88 Tex. 20, 29 S. W. 233; Railway Company v. Hewitt, 67 Tex. 479, 3 S. W. 705, 60 Am. Rep. 32. But this rule the court holds, and which was approved by the Supreme Court, imposes upon the servants of railway companies only the duty of keeping a lookout along their tracks ahead in the direction in which the trains may be moving to avoid collisions with and injury to any person who may be upon the track. To impose the duty upon the servants of a railway company to look ahead to discover persons who may be upon its track in front of an approaching train, and thus avoid injury to such persons, is a practicable and reasonable rule, but to impose upon them the further obligation or duty to inspect their trains being switched in their yards when or after being set in motion for the purpose of discovering and avoiding running over and injuring even children who may be trespassing upon their premises and cars is to impede the progress of their work, and, as

said in Railway v. Davis, supra, place upon them an unreasonable and unjust burden. We do not think that either the case of Railway Company v. Abernathy, 28 Tex. Civ. App. 613, 68 S. W. 539, or Ollis v. Railway Co., 31 Tex. Civ. App. 601, 73 S. W. 30, or any other case cited by able counsel for appellee, would warrant us in holding that such a duty rested upon appellant under the circumstances of this case; and such would be the effect of our holding were we to sustain the view of able counsel for appellee, as we gather it from their brief, and affirm the judgment of the lower court. The cases last above cited were relied upon in Davis' Case, and the Court of Civil Appeals held they were not in point. For practically the same reasons that they were held inapplicable in that case they are not applicable in the present case.

[3] But, if we should be mistaken in the views expressed above, and it be conceded that it was the duty of the servants of appellant to have kept a proper lookout to discover the presence of Carlean Moss, and thereby avoided injury to him, still we think it cannot be said from the facts and circumstances shown that the failure to keep such lookout was the proximate cause of his injury and death. This view is supported by the decision of the Supreme Court in the case of Railway Co. v. Shoemaker, 98 Tex. 451, 84 S. W. 1049. Just when Carlean Moss got upon or in dangerous proximity to appellant's train, how long he had been upon it or near it before he was struck or run over, what his position was, whether concealed under the train, swinging onto or attempting to get on it, is not shown by the evidence. In the case of Railway Co. v. Shoemaker, supra, the Supreme Court, after discussing the question of the failure of the employés of the railway company to keep a proper lookout, said:

"But, aside from this, the failure to keep a proper lookout, either from incapacity or other reason, could only be deemed the proximate cause of the death, when it appeared that the keeping of it would have prevented the unfortunate occurrence, and no inference of this fact can be drawn from the evidence. What were the boys doing as the train approached them? How long were they on the track before they were struck? What was their position? An answer to these questions must be found before it can be said that there was a failure to keep a proper lookout, and that such lookout would have discovered them [the boys] in danger in time to have enabled those controlling the train to have saved them; and for such answer the evidence may be searched in vain. This fact of causal connection between an alleged negligent act or omission and an injury can no more be presumed than can the act or omission itself."

This language is applicable here, and, the evidence contained in the statement of facts sent to this court failing to show what Carlean Moss was doing when struck by appellant's train, how long he had been in close proximity to the train, or what his position was when struck, it does not appear that the keeping of a proper lookout would have pre-

vented the sad and unfortunate accident which resulted in his death. If the views expressed are correct, and we believe they are, it becomes unnecessary to consider other questions presented in appellant's brief.

Holding, as we do, that the evidence was insufficient to authorize a recovery by appellees, and the case having been fully developed, the judgment of the court below will be reversed, and judgment rendered in this court for the appellant.

Reversed and rendered.