**WESTBROOK et ux. v. TEXAS & P. RY. CO.**

No. 2586.

Court of Civil Appeals of Texas. Eastland.

May 23, 1947.

Rehearing Denied June 20, 1947.

Smith & Smith, of Anson, for appellants.

Wagstaff, Harwell, Wagstaff & Alvis, of Abilene, for appellee.

GRAY, Justice.

Appellants W. R. Westbrook and wife, sued appellee, Texas & Pacific Railway Co., for the alleged killing of their two year old child by one of appellee's passenger trains on or about April 14, 1943. The fatal accident occurred about two and a half or three miles west of the section station at Tye. W. R. Westbrook was employed as a section hand by appellee and a Mr. Reeves was his foreman. The railroad track ran in an east and west direction from Tye to near the scene of the accident. On the north side of the right-of-way was Highway 80, which was intersected by a public road crossing the track and extending on south to Camp Barkeley. Appellants lived in a small house about 78 yards south of the railroad and about 60 feet east of said Camp Barkeley road. A picture in evidence and admittedly correct, showed that at about the place of the accident, the railroad track curved to the northwest rather sharply and into a draw. The train which killed said child was an eastbound troop train. No eye witness to the tragedy testified.

Plaintiffs pleaded a number of specific acts of negligence by defendant: (a) That said train at the time was being operated at

an excessive rate of speed; (b) that the whistle was not blown for the crossing, nor the bell rung; (c) failure to keep a proper lookout; (d) failure to use all means at the command of the train crew to stop the train after discovering said child standing or being too near the track; (e) failure to discover the peril which said child was in; (f) pleaded that the track was straight, smooth and level for 900 or 1000 yards to the west of the scene of the accident; (g) failure to apply the brakes in time to prevent the accident; (h) conditionally pleaded that if the train crew discovered said child at or near the track, they were guilty of negligence in not ringing the bell, blowing the whistle and giving an alarm, and in failing to apply the brakes and to use all means at their command to stop the train; (i) if said train was not equipped with proper brakes and stopping equipment so that it might be stopped within 900 feet, then defendant was guilty of gross negligence in such matter; (j) that operating said train at such excessive rate of speed was unlawful and dangerous and showed lack of control: that all of said acts of negligence and carelessness, and each of them constituted proximate cause of the accident. Plaintiffs further pleaded that the prior settlement and release was obtained through false and fraudulent promises of employment by defendant's agents, with no intent to perform the same, and without performing same.

Defendant pleaded general denial; that said child was at said time and place a trespasser and had no right to be there, and that the operators of the train had no expectation that the child would be there; that such place was not a public or private crossing; that said right-of-way at said place was enclosed with a barbed wire fence of five wires; that plaintiffs were guilty of negligence in permitting said child to be on said right-of-way and tracks at said time and place, and were guilty of contributory negligence in not keeping a proper lookout for said child, and in not keeping it off of the railroad tracks, all of which acts, singularly and collectively, were direct and prox'mate causes of the accident. Defendant further pleaded that said train was a troop train of seventeen coaches, and that in approaching from the west to the place of the accident, it came out of a draw and up a grade and through a cut in the embankments and on a curve, and the operators of said train in the exercise of ordinary care, could not see said child on or about the railroad tracks where he was, and had no right to be, and was not expected to be, until such train was in such close proximity that in the exercise of ordinary care and with safety to the equipment and passengers on the train, the operators of same could not have stopped the train in time to have avoided the accident, and that same was an unavoidable accident. Defendants further pleaded said settlement, payment and release and the provisions of same, accord and satisfaction, and estoppel.

Plaintiffs testified in their own behalf, and without calling any other witness, rested their case. Thereupon, defendant filed its motion for an instructed verdict in its favor, setting out grounds therefor. The court withdrew said case from the jury and rendered judgment for defendant, to which action of the court, plaintiffs excepted and gave the customary notice of appeal.

Appellants allege error on the part of the trial court in not submitting said case to the jury, and in rendering judgment for appellee. We think that there are two controlling issues in the appeal, viz.: (a) Whether appellants produced sufficient evidence of negligence by appellee and proximate cause to warrant submission of said issues to the jury; (b) whether there was sufficient evidence of fraud by the agents of appellee in inducing said settlement agreement to present a jury question; and (c) the minor question as to whether the rule of res ipsa loquitur should be applied to this case.

On the issue of negligence, there was no evidence whatever as to the rate of speed at which said train was being operated at said time and place, nor as to what would constitute an unlawful or excessive rate of speed. From the picture in evidence, it is clear that immediately before reaching said public road crossing and the point where the accident occurred, the train was com-

ing upgrade, which would probably have the speed at which it had been traveling. As to whether before approaching said crossing, the whistle was blown and the bell rung, we must look solely to the testimony of Mrs. Westbrook, who testified that she was sitting on her front porch engaged in sewing: that she did not hear either whistle or bell, and that had they been sounded, she would have heard them. But a week after the accident, Mrs. Westbrook made a written statement from which we quote:

"On April 14, 1943, it was only ten or fifteen minutes before the accident occurred that my two sons were in the house with me watching me do some embroidery work. I laid down on the bed and do not think that I dropped off to sleep. I heard the children go out of the house, that is, heard the bicycle screech, also, the wagon wheels as they were playing around the house. I did not hear the train going by the house in which I live, and which is about 500 feet south of the railroad track. The first I knew of the accident was when some member of the train crew came to my home and told me of the accident. I was just fixing to get up from the bed to see where the children were when the man came to the door. He said, 'your child has been struck by the train.' I then went down to the track and saw the child."

Mrs. Westbrook admits that said statement was read to her before she signed it, and was made immediately after the accident, while the oral testimony was given about three and a half years afterward. The statement strongly indicates that Mrs. Westbrook may have been asleep at the time. This view finds support in the fact that she did not even hear the train. It contradicts her oral testimony. The evidence shows that there was a whistling post about 80 rods west of said public road crossing, and it might more plausibly be assumed that the operators of the train did their duty than that they were willfully negligent. But for the purpose of this discussion, we may assume that no alarm was given. Then appellants had the burden of establishing by competent evidence a causal connection between such negligence and the fatal accident. It is not enough merely to prove negligence on the part of the wrongdoer. The complainant must go farther and prove proximate cause. Here again, the record is silent as to direct proof, or as to circumstantial evidence sufficient to support a finding of proximate cause. Furthermore, there is no evidence as to the alleged failure of the operators of said train to keep a proper lookout. Neither of the witnesses saw the train in motion before the accident and were, therefore, unable to testify to any act of omission on the part of the train crew. The same may be said as to discovered peril. As has been said above, said train was coming out of a draw, around a curve and through a cut which obscured the view of the trainmen until they neared the public road crossing and the point of the accident. The record is silent as to when the operators of the train first discovered said children on the track or right-of-way. But the evidence did show that about half of the train extended east of the point of the accident and half of it west of said point, which indicated a quick stopping of the train, and that the operators thereof used all means at their command to do so. There was likewise no proof as to the defectiveness of the brakes, but the quick and effective stop of the train negatives the allegation that the brakes were not in good condition. We have searched the record for evidence as to negligence and proximate cause on the part of the operators of said train such as would present a jury question or support a judgment, but have found none.

A case similar in many respects to the case at bar is Campos v. St. Louis B. & M. R. Co., Tex.Civ.App., 43 S.W.2d 487, by the San Antonio Court, the main difference being that in that case, the accident happened at a grade crossing in the night time and the deceased was an adult. We quote:

"It may be assumed, as a matter of law in view of the directed verdict, that Campos was killed by appellee's train. It may be further so assumed that the operators of appellee's train were guilty of negligence in approaching the public highway crossing near the point of the accident without ringing the bell or sounding the whistle

of the engine, as required by familiar statutes (Rev.St.1925, Art. 6371 [Vernon's Ann.Civ.St. art. 6371]). These two presumptions arise from known facts. But there seem to be no facts upon which further presumptions may be indulged. The profoundest mystery obscures every other circumstance leading up to and surrounding the tragic event."

Quoting further from said opinion:

"Assuming that the duty of ringing the bell and sounding the whistle was intended for the benefit of Campos, who was not shown to have been on the crossing at or about the time the train approached, there is no circumstance in the case tending to show that this omission had any relation to the accident, or caused or contributed in any degree to that event. In short, there is nothing in the record that would warrant an inference that the failure to give those signals was in any sense or to any degree the proximate cause of Campos' death. In this situation the trial court properly directed a verdict for appellee. [Texas & P.] Ry. [Co.] v. Shoemaker, 98 Tex. 451, 84 S.W. 1049; [Houston, E. & W. T.] Ry. [Co.] v. McHowell, Tex.Civ. App., 278 S.W. 258; Id., Tex.Civ.App., 2 S.W.2d 550." See also, Dixon v. Texas & P. R. Co., Tex.Civ.App., 164 S.W.2d 252.

In the case of Webester et al. v. Henwood, Tex.Civ.App., 134 S.W.2d 333, 334, by the Waco Court of Civil Appeals, Justice Alexander delivering the opinion, there was also an instructed verdict for the Ry. Co. The suit was for the alleged negligent killing of Lorenzo Webester, and substantially the same questions were presented in the appeal as we have under review in this case. We quote:

"There was no evidence whatever to sustain plaintiffs' charge that the switch engine in question was being operated at an excessive rate of speed or that the employees in charge thereof failed to keep a proper lookout. For the sake of the discussion, it may be assumed that the evidence was sufficient to have justified an inference that Webester was struck by defendant's switch engine, and that the employees in charge thereof were negligent in failing to sound the whistle or ring the bell, but we are left wholly in the dark as to how the accident occurred. There was no evidence whatever that such negligence, if any, on the part of the defendant was the proximate cause of the accident. The burden was on the plaintiff to not only prove the negligence of the defendant, but that such negligence was the proximate cause of the injury, for there is no presumption that the negligence proven was the proximate cause of the injury. Missouri Pacific R. Co. v. Porter, 73 Tex. 304, 307, 11 S.W. 324; Caliandro v. Texas & Pacific R. Co., Tex.Civ.App., 103 S.W.2d 439. It is undisputed that the lights on the engine were burning and that the engine was making a great noise—sufficient to awaken those living near the track— yet, the deceased either went onto the track or remained thereon in the face of the approaching engine. From these and other facts proven, it would be as reasonable to presume that the accident was caused by the deceased's own contributory negligence as it would that it was caused by the negligence of the defendant's employees. Where the facts and circumstances in evidence thus wholly fail to establish with any reasonable certainty the manner in which the accident occurred, a jury would not be authorized to presume that it resulted from the defendant's negligence in failing to ring the bell or sound the whistle. Texas & N. O. R. Co. v. Warden, 125 Tex. 193, 78 S.W.2d 164. The vital point is that the plaintiffs wholly failed to establish any causal connection between the defendant's alleged negligence in failing to ring the bell and sound the whistle and the injury to the deceased. Since proximate cause cannot be presumed from the mere happening of the accident, but, like any other essential element, must be established in some manner, either by direct or circumstantial evidence, and since the plaintiffs wholly failed to meet this essential requirement, the trial court properly instructed the jury to return a verdict for the defendant. 30 Tex.Jur. 799; Texas & P. R. Co. v. Shoemaker, 98 Tex. 451, 84 S.W. 1049; Missouri P. Ry Co. v. Porter, 73 Tex. 304, 11 S.W. 324; Texas & N. O. R. Co. v. Crowder, 63 Tex. 502;

Houston, E. & W. T. R. Co. v. McHowell, Tex.Civ.App., 278 S.W. 258; Campos v. St. Louis B. & M. R. Co., Tex.Civ.App., 43 S.W.2d 487; Missouri K. & T. R. Co. v. Greenwood, 40 Tex.Civ.App. 252, 89 S.W. 810; Kelley v. Burlington-Rock Island R. Co., Tex.Civ.App., 100 S.W.2d 164; Western Tel. Corp. v. McCann, 128 Tex. 582, 99 S.W.2d 895; Chandler v. Texas & N. O. R. Co., Tex.Civ.App., 103 S.W.2d 811; Caliandro v. Texas & P. R. Co., Tex.Civ.App., 103 S.W.2d 439; Texas & New Orleans R. Co. v. Warden, 125 Tex. 193, 78 S.W.2d 164; Texas & P. R. Co. v. Shoemaker, 98 Tex. 451, 84 S.W. 1049."

The cases from which we quote above, relate to fatal accidents at grade crossings open to the public. But in this case, the fatal accident occurred some distance from the grade crossing and in the railway company's enclosure. In said cited cases, there were no suggestions of trespassing, as the victims presumably had a right to be upon the premises. This case presents an entirely different situation. If instructed verdicts in favor of the railway companies were justified in the cases mentioned, for much stronger reasons, the trial judge was justified in withdrawing this case from the jury and in rendering judgment for appellee.

■■ Appellee contends that the victim of said accident was a trespasser, citing 45 Corpus Juris, P. 753, Section 152, to the effect that no higher duty exists with reference to an infant trespasser than to an adult trespasser. The courts of Texas have recognized and applied this rule. See Gulf Colorado & Santa Fe R. Co. v. Moss, Tex. Civ.App., 180 S.W. 1128: Stanford Oil Mill Co. v. Barnes, 103 Tex. 409, 128 S.W. 375, 31 L.R.A.,N.S., 1218, Ann.Cas.1913 A, 111: Dobbins v. Missouri K. & T. R. Co., 91 Tex. 60, 41 S.W. 62, 38 L.R.A. 573, 66 Am.St.Rep. 856. It was not contended that there was anything about the track or right-of-way at or near the place of the accident to attract or entice children. Mr. Westbrook admitted that Mr. Reeves, his section foreman, had several times warned him to keep his children off the track, the last such warning being only a few days prior to the accident. Certainly, there was nothing to put the opera-

tors of the train on notice that children might be on the right-of-way in said locality.

■ In their brief, appellants insist that the rule of res ipsa loquitur should be applied to this case. However, it was not pleaded. Having pleaded specific acts of negligence, to prevail, they must have proved their specific allegations, unless in their pleadings, notice was given to the defendant that they would not be limited or restricted to proof of their specific allegations, but would also rely upon general allegations of negligence. Wichita Falls Traction Co. v. Elliott, 125 Tex. 248, 81 S.W.2d 659 Page 667, subheads 6 & 7: Honea v. Coco Cola Bottling Co., 143 Tex. 272, 183 S.W.2d 968, 160 A.L.R. 1445. But had it been pleaded, we would be constrained to hold that the facts of the instant case do not bring it within the rule. See Hawthorne v. Texas & N. O. R. Co., Tex.Civ.App., 84 S.W.2d 1015 and authorities therein cited

■ Appellants allege error by the trial court in refusing to allow Robert Westbrook, the eight year old son of appellants to testify on the trial. When offered as a witness, appellee made objection because of his age and immaturity. At the time of the accident, this proffered witness was with the child who was killed, but at said time, he was only five years of age. The trial was had some three and a half years later. The trial judge examined the said child as to his competency, and from the answers, concluded that he did not understand the nature of an oath or the consequences of swearing falsely. The statute does not fix the age at which children are competent to testify in court, but under the common law, in civil cases, children fourteen years of age are presumed to be competent. Under that age, no presumption prevails, but the matter rests within the sound discretion of the court. In the instant case, the careful trial judge saw and observed the said child and questioned him. We cannot say that he abused his discretion in refusing to allow him to testify. See 44 Tex.Jur. P. 1009, Sec. 57; North Texas Construction Co. v. Bostick, 98 Tex. 239, 83 S.W. 12.

Moreover, appellants did not perfect their bill of exception to such refusal.

██ . Appellants allege fraud on the part of appellee's agents and employees in the matter of procuring a release on prior settlement of appellant's claim growing out of the accident, by the promise of employment to W. R. Westbrook without performance of, or intent of performance. Since appellants wholly failed to prove negligence on the part of appellee, or proximate cause, it would seem that appellants were concluded by such failure. That the said child was killed by appellee's train must be conceded. But proof of negligence and proximate cause were facts to be proven to establish liability. If it should be admitted that there was some evidence of fraud as alleged, appellants would still be without a cause of action because of failure to prove negligence and proximate cause.

 But from a close examination of the record, we have reached the conclusion that no fraud was shown such as would present a jury question. The settlement was reached about a week after the accident, appellee being represented by its claim agent, with Mr. Reeves, section foreman, present during the preliminary discussion and playing a minor role. The claim agent denied all liability, but offered to pay the funeral expenses of the child, estimated to be fifty or sixty dollars. The offer was declined and the claim agent then offered to pay $100. Westbrook asked for time to consider and "sleep over it," which was granted. The following morning, the parties met at Merkel and closed the matter, appellants executing a release and the claim agent delivering to them a draft for $100, which they cashed. Immediately after the funeral, appellants had moved to Merkel, thus forfeiting his employment on the Tye section, but Westbrook, upon recommendation of Mr. Reeves, was given a job on the Merkel section and began work there on Monday following the settlement. During the first day on the Merkel section, he dropped a cross tie on his foot, which disabled him for several weeks and eventuated in the filing of a suit against appellee, which was compromised by paying Westbrook $450. After convalescing from his accident, he applied to the section foreman at Merkel for permission to go back to work, but was told that he should be in a hospital. Later, he was inducted into the military service, and from his earnings and allotments to his wife, they were able to buy a home.

As to the alleged promise of employment, on direct examination, Westbrook testified as to the conversation between the claim agent and himself with references to the offer to pay the funeral expenses, following which, he was asked: "State whether or not he offered you anything besides this." Answer, "No sir. He didn't offer—He just said we would settle for the funeral expenses, asked for."

"Q. Did you have any conversation with Mr. Reeves? A. Yes, sir: Mr. Reeves, he nodded his head as. I went out (of the car) and he said, 'If you sign off, you probably got a job for the rest of your life,' or something to the effect of that.

"Q. Was that matter discussed with the claim agent too? A. No, sir: He was in the car. Mr. Reeves was kind of in front of the car, leaning up against it and I got out of the car and walked over there where he was. Me and him done the talking ourselves.

"Q. You and the claim agent? A. That's right.

"Q. There in the car? A. That's right.

"Q. The claim agent didn't say anything about giving you a job did he? A. Well, the way I look at that the claim agent—

"Q. The claim agent didn't say anything? A. No, sir. He didn't say nothing about it right there.

"Q. He never did say anything to you about giving you a job did he? A. He said something about I would probably have a job.

"Q. You said Mr. Reeves said that? A. They both said it.

"Q. Mr. Fahrenkamp told you that too? A. Yes, sir. I believe that was his name.

"Q. When did he tell you that? A. The way—he told me that that afternoon; that afternoon, he told me.

"Q. That afternoon, that you would probably have a job with the Company if you made a settlement? A. Yes.

"Q. Now, tell me just exactly what he said. A. Well, the way he spoke that, he said 'If you will sign off, you will probably be fixed up with them for a long time to come.' He says, 'we are not forced to give you a thing under the circumstances.'

"Q. Well, he didn't say definitely they would give you a job did he? A. Not definitely, no.

"Q. And Reeves didn't tell you definitely that they would give you a job did he? A. Reeves was pretty certain that they would.

"Q. But he didn't promise you any job did he? A. Yes.

"Q. Didn't he tell you that they might do it? A. No, sir. There was no 'might' to it. I just got through telling you that Mr. Reeves told me 'yes,' he says, 'You will be fixed up.' He says, 'You will probably work yourself up.' There was no might to it.

"Q. Probably? A. No. He didn't say no probably. He said, 'he would.'"

This alleged conversation took place the day before the settlement. The next morning, the negotiation was renewed. Westbrook testified as follows as to what was then said:

"Q. And you and your wife talked about settlement that night, didn't you? A. Yes, sir.

"Q. And then the next morning Mrs. Ashby brought you back to town and you saw the claim agent? A. Yes.

"Q. And you sat in the claim agent's car, didn't you? A. That's right.

"Q. And he told you that he would pay you one hundred dollars in full settlement didn't he? A. That's right again.

"Q. And he gave you a check and you took the check didn't you? A. Yes, sir. After some argument.

"Q. Anyway you took it didn't you? A. That's right. Sure.

"Q. And you also signed a release didn't you? A. Yes, sir. I signed a release.

"Q. And you knew at that time that's all you were going to get, didn't you? A. Yeah.".

The testimony was indefinite and contradictory. It plainly shows that Westbrook expected nothing more than the one hundred dollars. Other testimony of both Mr. and Mrs. Westbrook was that at the time of settlement, they were strongly urged by her relatives to make the settlement. Even should it be contended that the evidence as to promise of employment was sufficient and competent to present a jury question, there remains the fact that no evidence was produced tending to show that such promise, if made, was not made in good faith, and with no intent to perform it. There is the further undisputed fact that plaintiffs appropriated the proceeds of said settlement and made no unconditional tender of same back to appellee.

The release contained the following provision: "To secure this settlement and the payment of said sum we hereby rely wholly upon our own judgment, belief and knowledge of the nature, extent and duration of said injuries, disabilities and damages and no representations or statement about them, made by doctors or by said Company or its representatives or agents or others have influenced us in making nor induced us to make this settlement. No promise of employment nor other agreement not herein expressed had been made by said Company, nor by any of its representatives, agents or employees." Mrs. Westbrook testified that she did not read the paper. There was no testimony that it was not read to her, or that she was prevented from reading it. The record is silent as to whether Mr. Westbrook read it, or whether it was read to him. He did testify that he knew he was signing a release.

The draft on its front page in bold type contained this statement: "In full and complete settlement and payment for personal injuries and damages received at Tye, Texas, April 14, 1943, account fatal injury to infant son Carlos Ramoine Westbrook." On the back of said draft in bold type above endorsement, "Read before endorsing."

The Supreme Court decision in Texas & Pacific R. Co. v. Poe, 131 Tex. 337, 115

S.W.2d 591, an appeal from this court, involves a fact situation very similar to· the case at Bar, and the same form of release and draft. The Railway Company, in addition to denials and other defenses, pleaded accord and satisfaction and estoppel. In said case as here, the plaintiff cashed the draft, kept the money and made no unconditional offer to return it. The trial court was of the opinion that no jury question was presented and gave peremptory instructions to find for the defendant. On appeal to this court; the trial court was reversed. Tex.Civ.App., 95 S.W.2d 505. On appeal to the Supreme Court, this court was reversed and the trial court affirmed. In applying the doctrine of accord and satisfaction to the facts of said case, the Supreme Court said:

"It is contended that the issue of fraud was raised as to the execution of the release by Poe, and that such issue also applied to the draft received and cashed by him. There is no controversy about the rule that if the railway company, by its agent, fraudulently induced Poe to sign the release, without reading it or having it read to him, or that he relied upon the statements as to its contents, and such statements on the part of the agent were fraudulent, Poe could avoid such release. 1 Tex.Jur. P. 256, § 11; 53 C.J. p. 1215, § 31; 1 C.J.S., Accord and Satisfaction, p. 546, § 43.

"The substance of Poe's contention is that the release signed by him was represented to him as being merely a receipt for the draft, and that he acted on such statements and signed the release. The acceptance of that contention will not relieve him from the effect of the testimony contained in this record. There are other barriers which are insuperable to his recovery. Admitting that Poe signed only a receipt for the draft, the fact remains unchallenged that he received the draft for an amount in excess of his time, and that the draft contains plain and unmistakable words that it was in full and complete settlement of his injuries. The draft also ·bore on its reverse side, where Poe was to endorse same, the further notice: "Read before endorsing." The evidence is undisputed that he kept the draft in his possession for several days, and that he had ample opportunity to read it and understand its contents. He then cashed the draft and retained the proceeds thereof.

"The exception to the rule above cited is fully recognized, and if applicable would control here. Under the facts in this case that exception will not save his cause of action from the general rule above stated, and permit him to recover. The basis of the railway company's defense to Poe's claim in this suit is not narrowed merely to the release signed by him, but such defense also rests on the draft accepted and cashed by him. Under the state of this record, Poe was concluded from a recovery against the railway company by the acceptance and cashing of the railway company's draft and the retention of the proceeds. Missouri, K. & T. R. Co. v. Morgan, Tex.Com.App., 210 S.W. 512; 1 Tex.Jur. P. 281, § 37; 1 C.J.S., Accord and Satisfaction, pp. 528-533, § 34."

The said case of Texas & P. R. Co. v. Poe, 131 Tex. 337, 115 S.W.2d 591, 592, has been followed in the following cases: Panhandle & Santa Fe R. Co. v. O'Neal, Tex.Civ.App., 119 S.W.2d 1077, 1081; Socony-Vacuum Oil Co. Inc. v. West, Tex.Civ. App., 137 S.W.2d 108; De Shazo v. Storage Co., Tex.Civ.App., 153 S.W.2d 206, 209; Fort Worth & D. C. R. Co. v. Larson, Tex. Civ.App., 169 S.W.2d 260. We· think the rule of law announced in said Poe case is the law of this case. Under the record here presented, we see no error in the action of the trial court in withdrawing said cause from the jury and in rendering judgment for the defendant.

The judgment of the trial court is af·· firmed.