**EL PASO NATURAL GAS COMPANY,
a corporation, Appellant,**

**v.**

**Thella HARRIS et al., Appellees.**

**No. 5968.**

Court of Civil Appeals of Texas.

El Paso.

Dec. 26, 1968.

Rehearing Denied Jan. 22, 1969.

Hardie, Grambling, Sims & Galatzan, El Paso, Rassman, Gunter & Boldrick, Midland, for appellant.

Warren Burnett, Bob Hoblit, Odessa, for appellees.

## OPINION

FRASER, Chief Justice.

This is an appeal in which the District Court of the above county granted judgment for $37,500.00 to plaintiff Thella Harris and the sum of $10,000.00 to the intervenor, Texas Employers Insurance Association; and the court further decreed that plaintiffs Oliver F. Harris and Jimmie Harris take nothing.

On the night of November 21, 1961, at approximately 4:00 A.M., one Buddy Keene Harris was found at the bottom of a 12-foot tank, unconscious. His body was close to the bottom of the ladder that led up to the top of the tank. He never regained consciousness and this suit was brought by his widow, Thella Harris, and his parents, Oliver F. Harris and Jimmie Harris, to recover damages for his alleged wrongful death. There is an intervention by the insurance company to recoup its loss. It must be kept in mind that plaintiffs sought damages and brought their suit against appellant, and not against the independent contractor who was the employer of Buddy Keene Harris.

The equipment present on the night of the accident consisted, roughly, of a well, a separator, the tank, and equipment for swabbing the well. The facts are that one Jimmy Olson, a drilling engineer for the El Paso Natural Gas Company, had been sent to this well about a week before the fatal accident. Through his superiors, a tank and separator, along with tubing to make the necessary hook-ups, were brought to the well. The swabbing operation was being done under contract between appellant and the J. P. (Bum) Gibbins Well Service, Inc., hereinafter referred to as the Gibbins Well Service for purposes of brevity. The Gibbins Well Service had nothing to do with the delivery of the tank and separator. The tank was hooked up by one Robert Hall, daylight operator for the Gibbins Well Service, who hooked up the tank and separator with the well. This was done some two days before the death of Buddy Harris. Mr. Olson, employee of appellant, authorized and supervised the hooking up work and checked the installed equipment before putting it into use. The tank and the separator were rented equipment. The Gibbins Well Service was an independent contractor. The tank was about twelve feet high with a ladder having about eleven rungs approximately one foot apart. This ladder was bolted or welded to the side of the tank. There is no evidence in this case that the ladder broke or lurched. The top of the tank was about eight or nine feet in diameter with three or four holes or hatches therein. The top of the tank was at a sloping or beveled angle, and was a tank that was used for other purposes—in other words, a sort of utility tank—and it was located some 150 to 200 feet from the well. The separator was hooked up and used two days and then bypassed. It appears not to have been in operation the night of the death of Buddy Harris. The well itself was what is known as a wildcat, and was eventually plugged and abandoned. It was brought out in testimony that, in that area, problems did occur with unexpected gas, and with gas of varying toxicity. Under Mr. Olson (employee of appellant), the Gibbins Well Service was ordered to swab and gauge the well with the crew working in 12-hour shifts. The gauge was taken from the top of the tank every two hours; and then, on November 20th and 21st, it was taken every hour. The record shows that Buddy Harris had been up and down the ladder a minimum of 26 times before the time of his fatal accident. He was making a 4:00 A.M. gauge at the time of his accident and death. His co-worker, or boss, described as relief night operator for Gibbins Well Service, pulled down the tarp that was put around the well to keep the wind out, and saw a lighted flashlight lying on the ground. He immediately quit his swabbing operation and went to the tank, where he

found Harris on the ground with his head almost under the edge of the ladder. He stated that he went back to the well and called for help and then covered Harris with his coat. In his written statement dated April 7, 1964, made at Kermit, Texas, he also said that Harris never regained consciousness in his presence. He further stated that he climbed to the top of the tank before the ambulance came, and got a strong smell of gas and came right back down the ladder. He said he did not have any trouble getting up or down the ladder and that the ladder was bolted securely to the tank and was not slippery. The appellee indicates that she believes her husband was gassed on top of the tank, thereby causing him to fall, but the only medical evidence was a death certificate which showed that Buddy Harris died of a broken neck.

Appellant's first point complains that the trial court erred in rendering judgment against defendant because there was no evidence of probative force to show how the accident occurred and, in particular, to establish that the death of Buddy Keene Harris was proximately caused by any negligence on the part of appellant. We think this point must be sustained.

The mere proof that an accident has occurred is, of course, not of itself any evidence of negligence. It must be borne in mind throughout this opinion that the only negligence applicable is the negligence which can be attributed to the appellant, and further, that this is a circumstantial evidence case. As illustrated in our presentation of the facts, no one saw the accident and no one knows how it happened. The burden of proof is always on the plaintiff to show that the injury was negligently caused by the defendant. Here we are confronted with a situation wherein appellee attempts to prove that Buddy Harris got too much gas on the top of the tank, which caused his fall, and the plaintiff must do so by circumstantial evidence. Under the facts present here, Harris' coworker did not see the fall, and in his testimony indicated that it could have happened as the result of one of several causes or in one of several manners. The circumstantial evidence needed must go beyond speculation and it must further prove causal connection between the injury and the alleged fault or negligence. Courts have stated that causal connection cannot be presumed any more than negligence it-self can be presumed, and neither can rest upon mere presumption, conjecture, surmise or speculation. The facts and circumstances in evidence must establish with reasonable certainty the manner in which the accident occurred; otherwise a jury would not be authorized to presume that it resulted from the defendant's negligence. Furthermore, where there have been several acts or possibilities, the same theory applies because it invites and requires the jury to speculate in order to reach a verdict. Big Three Welding Equipment Company v. Reeh, 301 S.W.2d 504 (Tex.Civ. App., San Antonio, 1957, n. w. h.); Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779, 782 (1949); 23 Tex.Jur.2d, Evidence, § 143, pp. 214, 215; Houston East & West Texas Ry. Co. v. McHowell, 278 S.W. 258, 261 (Tex.Civ.App., Beaumont, 1925, err. dism.); Westbrook v. Texas & P. Ry. Co., 203 S. W.2d 279 (Tex.Civ.App., Eastland, 1947, wr. ref., n. r. e.).

Appellee vigorously replies to the statements and authorities set forth by appellant in its first point. She points out that appellant has asked the court to render judgment in its favor under its points of error, thus requesting relief as a matter of law on the evidence requiring us to review the testimony under rules of "no evidence" points of error. Appellee further points out that the evidence, therefore, must be viewed in the most favorable light in support of the findings, and we must consider only the evidence and the inferences which support the findings and reject the evidence and inferences which are contrary to the findings. With this statement we agree, and consider the various matters of evidence accordingly.

Appellee states that her husband was entitled to the presumption that he was exercising ordinary care for his own safety while performing the gauging operation, and cites cases in support thereof. We also agree with this statement of the law. However, in the case before us there is no evidence whatever of what caused the accident or the manner in which it occurred. As a matter of fact, the death of Mr. Harris could have resulted from a number of things for which the occupier, or appellant, could not be responsible. It could have resulted from some failure or negligence on the part of his own employer. It also could have resulted from the conditions that were present. Robert Hall testified that he had cautioned Mr. Harris about the slipperiness of the mud and stated that he, Mr. Hall, had put a burlap sack on the top of the tank to keep from sliding on it. Mr. Hall also testified that there was a heavy fog or dew which probably contributed to the muddy condition between the tank and the well. Many of these items, such as the weather and the mud, certainly could not be attributed to any negligence on the part of the appellant. Mr. Harris may have fallen from the top rung of the ladder. We are not saying in this opinion that he did, but merely enumerating some of the things that could have happened to cause his death and which could not have been attributed to negligence on the part of the appellant. Mr. Hall also testified that he cautioned Mr. Harris about the gas, although there were three open hatches on the top of the tank to let it out.

██ Appellee takes the position that the cause of Harris' death must be based on circumstantial evidence because of the absence of eye witnesses to the accident. Again we agree, because there is no evidence by any eye witness, and the only medical testimony consists of the statement that this 19-year-old boy died of a broken neck. No one knows how it was broken, the only evidence being that he was found at the bottom of the ladder in an unconscious condition from which he never recovered.

██ Appellee vigorously asserts that Harris' death would not have resulted but for the negligence of the appellant in not testing the gas and in not providing a tank with a platform and handrails for the gauging operation; in other words, in not providing Harris with a safe place to work. She cites various cases, but we do not find any of them directly in point with the condition that existed here on the night of Harris' death. We have no evidence that the absence of a platform and handrails had anything to do with the death of Mr. Harris. We can only speculate that it might have or might not have. It is in the record that Robert Hall, daylight operator for the Gibbins Well Service, testified that on the night in question there was presence of a gas odor emitting from the open hatches in the rented test tank. There is no question that the employer owes the employees of an independent contractor the duty to provide them with a safe place to work. Cases on this point are numerous and we will not set them out except to refer to Halepeska v. Callihan Interests, Inc., 371 S.W.2d 368 (Sup.Ct., December 1963). This case thoroughly discusses the "no duty" rule or doctrine, but it, and other cases, do not require the occupier to tell the employee of the independent contractor something he already knows. It is in the record that Harris knew that gas had come in some degree in spurts from this well, and that at one time he had to step back from the wellhead to get some fresh air. It is the *hidden* and *unknown* danger that occupier must call to the attention of the independent contractor. Many of the cases cited by appellee are injury cases where testimony can be adduced. As we have said before, we have here a case in which nobody has any information as to how the accident happened. As stated in the brief of appellees, Harris had gauged the tank at least 26 times before his fatal accident and had never complained or made any comment concerning gas in the tank.

We feel, therefore, that such circumstantial evidence as was present was not sufficient to prove the cause of death, and that all we have here is speculation or conjecture. Appellee asserts that the possible presence of gas, as testified to by Mr. Barron, was the remainder of the gas that appellee claimed caused the death of Mr. Harris.

Appellee urges that appellant, being the owner of the well, should have discovered and tested this gas before the swabbing operation began, and that its failure to do so constituted a failure to provide Mr. Harris with a safe place to work; but the record shows that Mr. Harris knew about the gas and had made a minimum of 26 trips up and down the ladder before his death. Further, Mr. Hall testified that this well had possibly less gas content than other wells in the same area. Therefore, we feel that appellee's position that appellant was negligent, and that such was a proximate cause of the accident, in not pre-testing the well and providing a tank with a platform and handrails for gauging operations, can be only speculation and conjecture, and does not meet the circumstantial evidence test. There is evidence in the record to the effect that this operation and the equipment used therein were usual and customary in this area. Further, Mr. Harris had *actual* knowledge that there was some gas at the well. He had also been warned about the gas. Further, he had had three years of experience in these oilfields. We do not have any evidence here that the death resulted from a danger that, as Judge Greenhill describes it in his article, "any fool could plainly see".

█ Appellee claims that appellant should have thoroughly tested the gas at the well as to volume, frequency of flow and toxicity, and perhaps have provided gas masks. Perhaps this is so, but it is clearly in the evidence that Mr. Harris was experienced in the oil business, had inhaled a whiff of gas at the well, and had been warned about the gas condition; and there is ample evidence that gas conditions in this particular area were extremely variable in volume, toxicity and occurrence. This point is sustained.

Appellant groups its authorities and arguments, under the second, third and fourth points of error, for the sake of convenience and brevity. We will treat these points in the same manner, as a great deal of the material in the points has already been disposed of in our discussion of the first point.

The appellant's second, third and fourth points are as follows:

### "SECOND POINT

"THE TRIAL COURT ERRED IN RENDERING ANY JUDGMENT AGAINST DEFENDANT, BECAUSE THERE WAS NO EVIDENCE OF PROBATIVE FORCE TO ESTABLISH THAT DEFENDANT BREACHED ANY LEGAL DUTY OWING BY IT TO BUDDY KEENE HARRIS.

### "THIRD POINT

"THE TRIAL COURT ERRED IN NOT GRANTING DEFENDANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE JURY'S VERDICT BECAUSE: (A) THERE WAS NO COMPETENT EVIDENCE OF PROBATIVE FORCE TO SHOW ANY BREACH OF ANY LEGAL DUTY OWING TO BUDDY KEENE HARRIS ON THE PART OF DEFENDANT; (B) UNDER THE UNDISPUTED EVIDENCE, AS A MATTER OF LAW, THE ACCIDENT WAS SOLELY THE RESULT OF TRANSITORY CONDITION: AND (C) THE UNDISPUTED EVIDENCE SHOWS THAT THE RISK INVOLVED WAS OPEN AND OBVIOUS, AND THEREFORE THE RULES OF VOLENTI NON FIT INJURIA AND NO DUTY APPLY.

## "FOURTH POINT

"THE TRIAL COURT ERRED IN NOT GRANTING DEFENDANT'S AMENDED MOTION FOR NEW TRIAL, BECAUSE THE COURT SUBMITTED ONLY EVIDENTIARY SPECIAL ISSUES, WHICH FAILED TO INQUIRE INTO THE ULTIMATE ISSUE OF WHETHER OR NOT THE DEFENDANT HAD BREACHED A DUTY TO PROVIDE BUDDY KEENE HARRIS WITH A SAFE PLACE TO WORK, AND THE VERDICT, WITHOUT ULTIMATE FACT DETERMINATION, WILL NOT SUPPORT THE JUDGMENT."

In its discussion of these points appellant again points out that the decedent and his fellow workers were admittedly experienced in such work and makes the further statement that every witness testified that temporary test tanks, such as the one involved in this suit, usually and customarily had neither handrails nor platform on them. Appellant then explains that swabbing is a common and routine process by which fluid is lifted from the well with a series of cups (usually rubber) or a wire line, the theory being to clean heavier fluids from the well by either a lift or suction principle in order that the lighter fluids may produce a flow. In these three points appellant again points out that Robert Hall, daylight operator for the Gibbins Well Service (the independent contractor) testified that on the night in question he personally warned Harris of the heavy dew or fog, of the wet and slippery conditions around the well location, the slickness on the ladder and top of the metal tank, and the presence of a gas odor then emitting from the open hatches of the rented test tank. According to the evidence, this warning was given by Mr. Hall before Harris went on duty or did any gauging on the night of his death.

Appellant asserts that the burden was on the plaintiff to establish by a preponderance of the evidence that appellant breached a duty owed to the decedent. McKee v. Patterson, 153 Tex. 517, 271 S.W.2d 391 (Sup.Ct.1954); Delhi-Taylor Oil Corporation v. Henry, 416 S.W.2d 390 (Sup.Ct.1967).

Appellant further maintains that it did not direct or control the employees of the Gibbins Well Service, give them any orders or have charge of the details of their work. In his testimony, Elvin Barron stated:

"Q And El Paso didn't try to direct the details of your work out there on that swabbing job, did they?

"A No, sir.

"Q They left that up to you, didn't they?

"A They told us, just told us the job they wanted us to do."

This same witness also testified that he did not consider the gas on the night of Mr. Harris' death to be unusually dangerous or any worse than on any other job that he had been on where he would encounter small quantities of gas. This testimony was elicited by appellant to emphasize its position that the work in question was not inherently dangerous work. With this position we must agree because, according to the record and testimony above mentioned, this was just an ordinary swabbing job. The jury answered, in Special Issues Nos. 1, 2, 3, 4 and 5, that the defendant-appellant should have provided handrails and platform on the temporarily rented utility test tank and should have tested their gas. Appellant submits that such issues were submitted in error, over its objections, and cites a number of cases holding that an owner is not liable for conditions arising after the independent contractor has gone to work and been placed in charge, the only exception being where the owner retained control. We think this is a

proper statement of the law as it now stands. Gulf Oil Corporation v. Wright, 236 F.2d 46 (5th Cir., 1956); Gulf Oil Corporation v. Bivins, 276 F.2d 753 (5th Cir., 1960). Witness Barron also testified that when he and Harris got out to the job, at about six or seven o'clock of the night of Mr. Harris' death, that the premises were safe and he began the swabbing operation. He was then asked the following question:

"Q At that momemt this well location was safe, wasn't it?

"A Well, yes, sir."

Appellant again quotes from Halepeska (supra), that there is no duty to warn a person of things he already knows, or of dangerous conditions or activities which are so open and obvious that as a matter of law he will be charged with knowledge and appreciation thereof. Appellant cites many other cases along this same line of reasoning, but we do not deem it necessary to encumber the record with them, as we have discussed this matter, we think, with sufficient thoroughness.

■ Appellant again points out that the number of times a plaintiff has been previously exposed to a particular risk is an important factor in the determination of whether such plaintiff had knowledge and appreciation of the danger such as would bar his recovery. Further, that such tanks as were used here are customarily used in temporary set-up thoroughout the West Texas territory, and that Harris had climbed and gauged the very tank and ladder in question some 60 times before his death. On the basis of evidence available, appellant urges that this was a case of volenti non fit injuria, and argues that Harris voluntarily exposed himself to such danger as existed, and emphasizes the fact that Harris knew of the gas and had been gassed one or two nights before the accident; and emphasizes again that Harris had been warned that there was a fog or heavy dew that would make the metal ladder and tank slick, as well as making the ground muddy and slippery. Appellant argues that the basis of invitor's liability for the dangerous condition of the premises rests upon his superior knowledge of the danger and applies only to defects and conditions on the premises which, in the nature of his duties, are not known to invitee and would not be discovered by such invitee in the exercise of ordinary care. Mirabel and Levy, "The Law of Negligence" (1962), pages 210, 211. It is also pointed out that one cannot create a duty on the invitor by voluntarily exposing himself to a known and appreciated risk. Greenhill, "Assumed Risk," 20 S.W.L.J. Vol. 1, pp. 13, 15 (1966); Delhi-Taylor Oil Corporation v. Henry (supra). Judge Calvert, of the Texas Supreme Court, states, at page 394 of said case: " * * * To impose the duty on the owner or occupier of the premises to know and to warn every workman on the project of a dangerous condition would subject him to an impossible burden. * * * " See also, for a thorough discussion of the duty of the occupier of premises to the invitee, Western Auto Supply Company v. Campbell, Tex., 373 S.W.2d 735. Again, it must be remembered that no one saw Harris fall or knows what caused it, and we do not believe the circumstantial evidence was sufficient to sustain the findings of the jury pertinent thereto and the verdict resulting therefrom. These three points of appellant are accordingly sustained.

Appellant has presented two further points of error, i. e., Points 5 and 6, but our disposition of the case makes any consideration of these points unnecessary.

For the reasons set forth above, the judgment of the trial court in favor of plaintiffs cannot stand.

The judgment of the trial court is accordingly reversed and judgment is here rendered that plaintiffs take nothing.